Good morning. Good morning, Your Honor. Tom Dupree on behalf of the United States. I please the Court. I'd like to reserve three minutes of my time for rebuttals. Okay. Let me just ask you a question right out of the start. How many people does this affect? That's a good question, Judge Callahan. I'm not sure of the exact number, but I do know that the record reflects that at least within the Ninth Circuit, counsel for plaintiff talked in the district court about how he had a number of clients, a significant number of clients, apparently, that would be affected by this order. Again, I don't have a hard and fast number to give you, but- No, but I think the, whether you want to call them that, I mean, counsel for the, well, they would be, I guess, they're the respondents at this point, or the appellees at this point, that they said you should have a better idea. Because what about people that say, are trying to get a family member into the country, but it's not a spouse? Those petitions take, those requests take longer, right? Generally, I think that's right, yes. I mean, here, of course, we are dealing with a subset of illegal re-entrants. In other words, we're not talking about individuals who are outside the country and are petitioning for permission to re-enter. What we're talking about is that group of illegal aliens who have already been ordered to remove from this country, and in fact, have left this country and then proceeded to break the law again by illegally re-entering. Well, I know that, but I'm just wondering, I mean, it's obviously an important case to both sides. And I mean, I think that we can all see that. But sometimes we know we're talking about 6,000 people. Sometimes I sense it's more than the people that are actually the parties here. But it seems that if the government's taking a point to come up here on this, that you would have some sort of idea. Right. Again, I don't have a hard and fast number. I don't believe we introduced anything along those lines in the district court. Was this important? Well, it can affect a lot of people. I think the answer to that is plainly yes. I mean, certainly, we wouldn't be here if we didn't think it was significant. Obviously, we thought that the Court's ruling in the Perez-Gonzalez case was significant as well. Here, of course, we believe that the outcome of this case is controlled by Section 1182A9C of Title VIII. That is the provision that says, in the case where you have an alien who affects an illegal reentry, that that person is permanently barred, permanently deemed inadmissible, unless he or she obtains a waiver, having waited 10 years. In the Perez-Gonzalez case, of course, a panel of this Court held, or at least suggested, over the dissent of Judge Gould, that — Well, Judge Gould dissented in the petition for rehearing. That's right. Not in the actual opinion. Well, that's true, but I think it's fair to say that his joining the initial opinion was either he rescinded it or took it back by saying he would have come out differently and adhered to the approach followed by the Tenth Circuit in the order on rehearing. You said the statute contains a permanent bar, basically. Well, with an exception, it's not applicable. But does that in any way require reinstatement to trigger that bar? In other words, if I — I'm getting at Perez-Gonzalez. Perez sort of went on that — on the theory that, well, we can give this relief because the reinstatement hadn't occurred at the time it was applied for. But is the C-9 bar to admissibility dependent on the reinstatement? It's not, Judge Canby. The C-9 bar is a blanket bar that says aliens who have reentered the country are ineligible or they are deemed inadmissible, period, unless they wait 10 years and then apply from outside the country to get that. So that's a blanket bar. Of course, the reinstatement provision says that when it's reinstated, then the removal order comes back up. Well, here's where I sort of am on this. You make the argument that there are — you say that Fernandez-Vargas, you know, changes things, and so, therefore, Perez-Gonzalez is not good law. But you make that argument, which I'm not finding that terribly persuasive. But the second one is Brand X, that you're saying that Brand X, that because of Brand X, that we should follow in the matter of Torres-Garcia. And that — to do that, you have to go back to Perez-Gonzalez and see what they did about Chevron deference, right? You're exactly right. Okay. And if we were to follow your Brand X argument, it would be the first time doing it in this circuit, correct? Yes. Although other circuits have followed. Well, in the context of the Torres-Garcia, yes, that's right. That would be the first time in this circuit. That's right. And as the Court knows, our position here is that the Perez-Gonzalez case was decided on a Chevron step two basis. In other words, that they did not say that Congress had spoken with sufficient clarity so that the Court could resolve it purely as a matter of statutory interpretation. No other interpretations are permissible. We think, of course, that in Perez-Gonzalez, the Court really focused on what the agency had said at that point in time by way of formal interpretation. Well, they're a little conflicted in this, because they do rely on the regulations, but then they say they're not giving Chevron deference to some memo, right? That's exactly right, Judge Kelley. And what they say is they say, here, in this case, all we have right now is what they called an informal policy guidance. They cited the Supreme Court's decision in Christensen, which, as the Court knows, is the seminal Supreme Court case talking about what you do in the context of informal guidances and whether or not Chevron deference need be accorded to those type of guidances. The Perez-Gonzalez panel then said, and this is on page 794 of the opinion, it said, in the absence of a more complete agency elaboration of its interpretation of the interaction between the statute and the rules, we're going to resolve it the way it did. So I think what the Perez-Gonzalez court was doing was exactly the process that the Supreme Court articulated in Brand X, in that it said, we don't think that this can be resolved as a matter of statutory interpretation. We're going to look to what, if anything, the agency has said. And because the agency has not issued a formal interpretation of the statute and the accompanying regulations, we're going to take a swing at it. And that's perfectly acceptable. And then when the Board of Immigration Appeals accepted the implicit invitation of the Perez-Gonzalez court and set forth its interpretation, that's the opinion on which the DHS memo at issue in this case was based on, and that's the opinion that we believe under Brand X is fully entitled to Chevron deference. That's Torres-Garcia. That's correct. That's correct, Justice Kennedy. What was the – remind me what the explanation in Torres-Garcia was of the apparent inconsistency with the regulations that – in other words, how do they answer the question that was posed to them at the end of Perez-Gonzalez? Well, I think they made a number of points, Judge Candy. One point is, I think, that they said there is not any inconsistency in the regulations, that the regulations can reasonably be construed to apply to the so-called first-time illegal inference, and that what we're dealing with here, of course, is a statute that expressly applies to the repeat offenders, as it were. So that's one way of getting at it. Then the board went on to say that even if the court were to say that these regulations apply to this segment of repeat offenders, that that would be impermissible, because what it would be doing is going beyond the terms of the statute. Judge Gould made this point in his denial from rehearing as well. And what the board is saying is that Congress has said, here's the provision with a permanent bar for illegal reentrance, and here are the circumstances under which an alien can obtain a waiver to cure that inadmissibility. The alien needs to wait 10 years. And the board said, that's what Congress has specified, is the way you get a waiver from that bar. And we, as an agency, are simply not in a position to promulgate regulations that would change, modify, or otherwise augment the system specified by Congress. Well, according to the law, excuse me, does Torres-Garcia then come and take the position that the regulations actually only do apply to first-time entrants? I think that's certainly a fair reading of the opinion, Judge Canby, in that that is certainly one of the points that they made, and that certainly the board didn't say our regulation is invalid. What they are saying is that the regulation can be read in this limiting way. They have to read it that way in order to make it not void under the statute. I think that's a fair assessment. I think where the board was coming down was pretty similar to where Judge Gould was coming down, and where, I should note, many other circuit courts have come down, including the Tenth Circuit and the Bellum case. So I think that what all of this goes to show is that the board's interpretation here is plainly a reasonable one. Let me ask you this, though, and you said this, but how do you – well, what do I do with the language in Perez-Gonzalez's standard of review section that when they say in the opinion that Chevron deference was not used in this case? What do I do with that? Do I say, but, aha, over here, look, you were looking at the regulations. You did use Chevron deference. So what do I do with that? Well, first of all, Judge Callahan, I agree that there are statements in the Perez-Gonzalez opinion that could be interpreted as the way plaintiffs do to say that it was resolving under Chevron's Step 1. But I think by far the better reading is that it was a Step 2 case. And so to answer your question about what you do with that is, we note, first of all, as Your Honor noted, it appears at the very beginning of the opinion in the standard of review section in the course of an opinion that addresses a large number of different issues of statutory and regulatory interpretation. In other words, it was a comment that was not made in the context of the issue presented in this case. It was a generalized statement at the beginning of the opinion. And then, as the Court knows, the panel spends several pages at length discussing why it was not going to defer to what it characterized as an informal guidance. It discussed the Christensen case. It talked about how its holding was predicated on the absence of a more formal opinion by the board. And so I think that if, Your Honor, were to ascribe overarching significance to that initial statement, which, again, wasn't specifically made in the context of this issue, at the beginning of the opinion, it would mean that the Court spent three or four pages of actual discussion in holding discussing an issue that was totally irrelevant, which I don't think is a fair reading of the opinion. Well, let me ask you this. Why didn't you file a petition for rehearing on Bonk or a petition for a writ of cert in Perez-Gonzalez? Well, it's we just come to this lately that we've decided that — I don't think so, Your Honor. I think that, as I'm sure the Court is aware, when the government makes a decision as to whether to seek on Bank or to petition for cert, there are a number of issues that come into play separate and apart from whether the government agrees or disagrees with the merits. It's a question of whether this is an appropriate case to present at this time, say, to the Supreme Court. Are there other circuits that have gone the other way? There's a resource question. And so I think the fact that the government elected not to pursue further rehearing I don't think in any way means that we — Well, now the Ninth Circuit's by itself in this view, though, correct? Every other circuit's gone the other way, right? That's exactly right. But is it your position that Perez-Gonzalez is wrong based just on the admissibility provision of Section 9c.i.2, or is it the interplay of the inadmissibility provision and the reinstatement provision? I think the answer is both. Certainly, we agree that they're wrong on the first point, but I think that the Court also erred in the first part of its decision where it talked about how when an alien files an I-212, that somehow that acts to prevent reinstatement. That's a separate issue, or a slightly separate issue, from the one that we've been discussing. But that, too, is an issue where all of the circuits to have addressed it have strongly criticized the holding of the Perez-Gonzalez Court, which I recognize in and of itself doesn't give this Court license to reevaluate that aspect of Perez-Gonzalez. But what I think does give this Court license to reevaluate that aspect is the intervening Supreme Court authority in Fernandez-Vargas. As the Court knows, in that case, the alien was, in this regard — But they didn't decide this exact issue. Well, I think it's implicit in the opinion, Judge Callahan. I think in Fernandez-Vargas, you had a case where the alien was similarly situated in this respect to the alien in Perez-Gonzalez, in that he had filed an I-212 waiver. But what went up to the Supreme Court was just the one issue, not the other. Not — there were two issues in front of the circuit, right? And you just — and one issue went up to the Supreme Court. In terms of the cert petition, yes. Your Honor is correct. But we would submit that the result that the Supreme Court reached in Fernandez-Vargas simply cannot be reconciled in any way, shape, or form with the panel's opinion in Perez-Gonzalez. Because if the Supreme Court had accepted the Perez-Gonzalez panel's approach, it would not have disposed of the case that it did, which is to say the instatement comes back in, end of story. Instead, it would have said, okay, now you've got to go back and you've got to adjudicate this I-212 waiver. So I think that the Supreme Court's holding is necessarily inconsistent with what the Perez-Gonzalez court said. So I think, again, that's yet another reason or another way in which Perez-Gonzalez has been called into question. But we accept the — the Brandeis argument. Can we adopt the matter of Torres-Garcia without convening an en banc court? Yes, absolutely. If I'm understanding Your Honor's question correctly, can you accept the — Because essentially we're overruling — Well — I mean — I mean, you can make that argument. This — well, I guess I would respectfully disagree with characterizing it as overruling. I think the Brandeis court actually made this point fairly explicit, where it said in a circumstance in which an agency subsequent to a circuit court decision comes forth with its interpretation, it's not — You resolved the Chevron deference issue. Right. If you say it was a Chevron step two case, yes. Yes. And that's not in any sense overruling the Perez-Gonzalez panel. In fact, we would submit that were this court to do that, it's 100 percent consistent with what the Perez-Gonzalez court itself said when it said in the absence of a more formal agency interpretation, this is what we're going to do. And the Board of Immigration Appeals got the hint. It accepted the invitation, said, here's our more formal agency interpretation. Here's why we're doing what we're doing. I think its interpretation was eminently reasonable, and for that reason, it's entitled to Chevron deference. Before my time expires, let me just say a couple quick words about jurisdiction. Of course, it's our position that the district court lacked jurisdiction under 8 U.S.C. 1252F to enter the injunction that it did. That's because the injunction had the effect of enjoining reinstatement, enjoining removal. And that's something that's squarely prohibited by that statute. In fact, the district court on page 160 of the excerpts of record admitted that. She said that, yes, her injunction will have the effect of impeding reinstatement provisions. And we would submit that that admission, then and there, really resolves that issue. She could not have done what she did. I think it's important to emphasize that 1252F does not in any sense preclude judicial review over these types of violations. Well, and it precludes jurisdiction to enjoin operations. 1252, I think, what is it, F1, precludes jurisdiction over actions to enjoin operations of provisions following under Part IV of Subchapter II of the INA. The district court's order, in contrast, enjoins an unlawful application of adjustment of status provisions which fall under Part V of Subchapter II of the INA. I can't do this without reading it. It's a challenge. But I will – what I will say is this, is that what the district court said is that she enjoined the government from giving legal effect, from giving legal effect to these rulings. And legal effect is the same as reinstatement in this context. And so I think that what Congress was saying when it enacted the provision is not that we're going to preclude judicial review over these types of claims, but rather what we're going to do is require Petitioners to proceed on an individualized case-by-case basis through the PFR process exactly as Mr. Perez-Gonzalez did when he obtained relief from this Court. So for that reason as well, we believe the judgment of the district court should be reversed, and I'd like to reserve the remainder of my time for rebuttal. Thank you for your argument. Good morning. Good morning. May it please the Court, I'm Matt Adams with Northwest Immigrant Rights Project for the plaintiffs. So how many of these people are there? It's unclear as we state in our briefing. I would have to estimate there are several hundred individuals out there who could potentially qualify. Clearly several hundred is a limited group. This is an opportunity that Congress extended to this small group, only these individuals who already had petitions filed by May of 2001. Congress gave them one last chance. But couldn't there be people out there that say we're using relatives other than spouses that just haven't quite come up, and they'll come up before they have the 10 years? I mean, can't there be some that have priority dates that are still waiting for visas? There are certainly other people who qualify under 245-I whose priority date has not yet arrived. And so in the future, they would then be able to submit their adjustment application pursuant to this penalty fee adjustment program that Congress extended under the law. But we don't know who, we don't know how many of those people there are. But we don't know how many of those are. What we do know is that in 1996, Congress eliminated penalty fee adjustment. They said from now on, when people enter the country unlawfully, they're going to have to go back to their home countries. But then in the Life Act of 2000, Congress said, we're going to give these folks one last chance. Anyone who can get a petition filed on their behalf prior to May of 2001 is still going to qualify under this old framework. And that's what this group is all about. That's what Perez-Gonzalez was looking at, this group of individuals who qualify under the old framework. In Perez-Gonzalez, this Court looked at 212-A9C, as well as the other grounds of inadmissibility. This Court looked at the adjustment application under 245-I. And this Court found that giving the statute its plain meaning requires the agency to adjudicate these applications, because the statute allows for these individuals to apply for permission to reenter the country. And the regulation makes explicit that if someone's unlawfully reentered, then if that they get a second chance, then that permission will be deemed retroactive to the date of their entry. Thus, they will be deemed to have unlawfully entered the country. Therefore, Section 212-A9C never comes into play, because 212-A9C only affects those who are found to have unlawfully entered the country. Well, we have to deal with the Brand X issue, though. And didn't, in Perez-Gonzalez, didn't the Court rely on Federal Regulation 212.2 to reach its decision? In Perez-Gonzalez, the Court first explicitly stated that it was under Chevron Step 1, that they were able to use the standard tools of statutory construction to find the plain meaning of the statute. And that's explicit in its decision, as the Court stated in the standard of review. However, the Court then, being careful, went on and said, even looking at this government's interpretation, if we were to analyze this, what we have to recognize is that the formal interpretation of the agency is the regulation itself. And the regulation itself makes explicit that this group of individuals, people who have been deported and unlawfully reentered, still have an opportunity to apply for adjustment. Now, the Court noted it's a risky proposition. They have to show that they merit this relief. It's a discretionary application. And if that application is denied, then they are subject to reinstatement or at least could potentially be subject to reinstatement if the government chooses to initiate those proceedings. But the Court made explicit in standard review that this was based on Chevron Step 1. The other thing I'd like to note about Brand X, Brand X and the cases that have looked at that are looking at whether a court must defer to an agency's regulation. In no case is there something where you have the government saying, well, we have our formal interpretation in the regulation, but we want you guys to look at this other interpretation. And that's what they're doing here. The government is seeking to avoid their own interpretation. The government continues to reject 8 CFR 212.2. Just as this Court found in Perez-Gonzalez, there is no way now to reconcile the government's position with its formal interpretation in the agency. And likewise, the Board of Immigration Appeals decision in Torres-Garcia cannot be reconciled with 8 CFR 212.2. Well, let's just say for this moment, I know you don't agree with this, but say if we say that Brand X applies here and therefore then we would go with the Torres case. Do you agree that if we did find that Brand X applies, we adopt the matter of Torres-Garcia and we can do that without going en banc? I would say that I know you don't agree with that. I realize that. But if we got to that point, what's your position on that? I would state that if the Court found that it was just an unambiguous statute or, rather, there was an ambiguous statute before, the Court issued its interpretation. The agency came back with its own formal interpretation. Then, yes, the agency had an opportunity to make a second stab at it. And the Court could move forward with the agency's interpretation and then look and see if the agency's interpretation should be deferred to. But in this case, just as with Perez-Gonzalez, so not relying on Perez-Gonzalez, but using the same logic, this Court would not be in a position to defer to the agency's interpretation. And that is because the agency's interpretation, even absent governing case law of the circuit, continues to do violence to its own regulation. This Court has repeatedly made clear in cases like Public Citizen and Wong-Slung v. INS that the Court will not defer to an interpretation of the agency that does not give effect to the plain language of its own regulation. And that's where we're at here. So if we accept your argument, though, then we would be we would be in conflict with the Tenth, the Fifth, and the Seventh Circuits, correct? We would be in conflict with the Tenth Circuit alone. The Tenth Circuit alone is the only one in a published decision that has come out and said this regulation is not in court. And it was interesting to look at what the Tenth Circuit said in Barham, because they said, well, maybe you could use that regulation to apply to first-time entrants, but that is internally inconsistent. If that was the first time that person entered the country, they would have never previously been deported or removed. Therefore, it would have been unnecessary for them to apply for this, because 8 CFR 212.2 only applies to individuals who have previously been deported or removed. And when it came down, I guess I would mention the government cited to the Eleventh Circuit decision, which was an unpublished decision, which disagreed with that. The courts holding in LaTav, which the government cites quite often, specifically found that the government, or rather that the Petitioner in that case, had never previously raised the I-212 argument, and therefore, it was waived, and he could not go forward. And he could not go forward. What about Mortara-Cruz and Lino v. Gonzales? In Mortara-Cruz, the court didn't address the regulation at all. And what we have here is so I think there are contrary decisions in other circuits, but it's by no means as overwhelming as what the government states. You have one published case on point looking at the Seymour issue in the Tenth Circuit, and that case makes a fundamental flaw in trying to interpret or give some type of meaning to 8 CFR 212 by failing to recognize that people who have never previously been deported would not need 8 CFR 212.2. Now, on Fernandez-Vargas, which is an argument versus Ashcroft, which is, I was questioning the government about that, what's your position on that argument? Fernandez-Vargas addressed one issue, and one issue only. Can the reinstatement provision be applied to reentries that occurred prior to the effective date of IRA-IRA? That Court's decision does not in any way contradict this Court's decision in Perez-Gonzalez. In fact, if you look at Perez-Gonzalez, the first holding of this Court was that these people with prior deportations prior to 1996 were subject to the reinstatement provision. But then the Petitioner in Perez-Gonzalez went on to ask or present a second issue to the Court, and in that second issue, the Court said, yes, if they qualify under 245i, and if they already have this affirmative application pending under this permission to reenter, then the government must first lawfully adjudicate that application. If that application is adjudicated and it's denied, that is, they don't demonstrate enough equity to show that they merit relief, then they will be subject to reinstatement. And that's how the Court concluded its decision. It does not in any way contradict the Supreme Court's holding in Fernandez-Vargas. And even the government's memo acknowledges this, because the government's policy memo that we're looking at here carves out space for how to treat some cases different than Ninth Circuit, than cases in other circuits. But if they really believe that Torres-Garcia and Fernandez-Vargas were intervening authority that controlled the issues presented, there would be no need for them to try to carve out a different way of dealing with the Ninth Circuit cases, because they have their new authority. This is just kind of a Johnny-come-lately support to the same old idea. They had their opportunity to litigate these issues. They filed petition for a hearing. They filed motion to reconsider. Both were denied. They did not seek further judicial review. Thus, they're bound to comply with the holding of this Court. And there's no intervening authority that contradicts the plain language of this Court in Perez-Gonzalez. Kagan. Well, Brandach, though, is after this Perez-Gonzalez was litigated, though, right? That's correct. Timing-wise. But once again, with Brandach's, there's two principal points there. One is that this Court found that it was relying on the plain language of the statute. And that's in the standard of review section. It says that explicitly. The government kind of attempts to carve itself an exception there by saying, yeah, but look at what they said when they talked about our interpretation. But that does not in any way undermine the plain and explicit finding of this Court that Chevron Step 1 was sufficient. That the standard rules of statutory construction suffice. And 2, with Brandach's, the government continues to have a formal interpretation. It's regulation. And anything that they do that undermines or does violence to their own regulation is not afforded any deference, regardless of whether there's judicial controlling judicial precedent. Moreover, if I jump to the section regarding jurisdiction, this Court has made clear in cases like Catholic Social Services v. INS, where the issue presented is under a separate subpart or subchapter of the Act, not under subpart 4, then the Court may reach those issues, and it may issue a preliminary injunction. Just like in Catholic Social Services, this case is presenting the issue whether the government may continue to deny applications for adjustment of status based on what we find is a faulty reading of the statute, a failure to comply with this statute in Paris-Gonzalez. The district court found that the government was incorrectly or incorrectly disregarding this Court's holding in Paris-Gonzalez, and as such, had jurisdiction to issue this injunction. This case does not challenge any reinstatement proceedings or any removal proceedings. Those are what occurs under subsection or rather subchapter or part 4 of the Immigration and Nationality Act. Kennedy, would the government be in contempt if it went ahead and reinstated removal orders of your party plaintiffs? Even though that's removed from what we're looking at, I believe they would. And that's because in Paris-Gonzalez, this Court found that first, you must lawfully adjudicate the applications. Well, if they'd be in contempt for violating it by reinstating, then they've enjoined reinstatement. It's an interesting question, because if they did go ahead and begin to reinstate or put people in removal proceedings, then I think the Court, you would have to go ahead and file a petition for review of that reinstatement order. And the Court would have to look at, now that they're already in these removal or reinstatement proceedings, what's the appropriate form? Do they move forward pursuant to 242 of the Act, or is it to go back and say, well, they shouldn't have been here in the first place? But what we're dealing with, in none of these cases were reinstatement proceedings initiated. For example, Ms. Estrada, there's two separate subclasses. The one subclass, they still have applications pending. And so the government doesn't have any argument that this preliminary injunction shouldn't be applied to them under 242-F. But there's the second subclass where an application has already been denied. And, for example, Ms. Estrada, one of our named plaintiffs, had her application denied back in September of 2005. Over the next year, the government didn't take any steps in her case. And this is typical in many situations, where applications are denied, and then these individuals are left in, as it were, limbo. They don't have an opportunity to then renew their work authorization. They're not placed automatically into removal or reinstatement proceedings where they have immediate access to challenge. It's unusual proceedings. No one's motivated to get to move things forward. You know, that's the, you know, it's a, I mean, we see things that have been going on for 10, 20 years. That is certainly true. But it's also true, as I have helped many individuals who've had applications denied by a local office and say, well, we've got to get this straightened out. I need my work permit so I can continue working. I need to get this figured out so my family knows whether we're going to be living here or we've got to figure out how to live in our country of origin. And they want to go forward. And many times we're left in that frustrating situation where we're trying to ex-I have to explain to my clients, well, there's no way for us to force the government to then go ahead and put you in removal proceedings. Because once you're in removal proceedings, we can have your application re-adjudicated. And this happens in context where people are denied as a matter of law or when they're denied as a matter of discretion. Perhaps they have a criminal incident and they needed to file a waiver, and we're trying to convince the government that they deserve this discretionary waiver. And the local adjudicating officer at the CIS office denies it. And then we explain to our clients, well, you're going to have a second shot to, to explain to a judge why you deserve this discretionary waiver. But we have to wait until they actually put you into proceedings. The bottom line is these cases do not involve anybody who is placed in removal or reinstatement proceedings. They only involve people who have pending applications or who have applications that were unlawfully denied, but the government has never taken any subsequent steps to move forward on either a reinstatement or removal proceeding. The other point I would like to make is going back to the government has stated that the board was saying, well, really, what their interpretation in the matter of Torres-Garcia can be viewed as is simply saying that first-time entrants are still eligible for I-212. They're under 8 CFR 212.2. But this reasoning has the same logical fallacy as that of the Supreme Court or rather, I'm sorry, the Tenth Circuit in Barham-Garcia. First-time entrants do not need permission to reapply, even if they've unlawfully entered the country. 8 CFR 212.2 only governs individuals who have been previously deported or removed. In the end, the board in matter of Torres-Garcia had to reject its own regulation. It said, well, this regulation is outdated. It's antiquated. It doesn't really implement the changes in the Immigration Nationality Act after 1996. But Congress itself recognized and explicitly referenced 8 CFR 212.2 in VAWA of 2005. There, Congress made reference to 8 CFR 212.2 and said it was its intent that the Attorney General, the Secretary of the Department of Homeland Security, and the Secretary of State continue to grant these permissions for persons who had unlawfully reentered after having been deported. It's therefore confirmed by Congress that 8 CFR 212.2 continues to be a valid regulation. Moreover, the agency itself has modified the regulation twice since the enactment of IHRA-IHRA, once again demonstrating its continued vitality. The bottom line is that there is a formal interpretation of the agency. That is the governing regulation. And that regulation is the only interpretation that this Court would even look at in trying to determine whether the agency merits deference. Because if the agency's own interpretations do not conform with the regulation, then this Court would not forward deference to that agency interpretation, regardless of whether there is controlling precedent. But in this case, there is controlling precedent. The government might not agree. The Tenth Circuit might not have agreed. And the Eleventh Circuit, in that unpublished decision, might not have agreed in looking at 8 CFR 212.2. But here in the Ninth Circuit, the law has been decided. This Court has reviewed the issue. The issue has been presented. And the government must abide by this holding. For this reason, the district court's preliminary injunction should be upheld. Thank you. Thank you for your argument. Let me begin by addressing the issue that my colleague raised about the question whether this is an outdated regulation. What the Board explained in Torres-Garcia is simply that the regulation in question on which the plaintiffs rely was enacted to implement a 1990 statute. The statutory provision that's at issue in this case, the 1182a9c provision, was enacted years later, in 1996, as part of IRIRA. And so what the Board – the point the Board made is simply that it doesn't make sense to say that when we promulgated this regulation, it was for the purpose of implementing this permanent bar on illegal reentrance. It obviously couldn't have been, because the permanent bar on illegal reentrance was enacted several years down the road. With regard to counsel's point about whether this is – Perez-Gonzalez is properly regarded as a Chevron Step 1 or Chevron Step 2 case, for the reasons I articulated earlier, there is one sentence in the decision that supports his argument. There are pages and pages that support our argument. And I would submit that the panel's opinion simply would make no sense if it was resolving the question as a matter of pure statutory interpretation. With regard to the question whether the Board's interpretation in Torres-Garcia was reasonable, I think the answer to that is plainly yes. Judge Gould obviously thought it was reasonable. The Tenth Circuit thinks it's reasonable. The Fifth Circuit says it's reasonable. The Eleventh Circuit, in an unpublished decision at least, says that it's reasonable. So I think that the vast majority or all the other courts that have addressed this issue have weighed in on the government's side. I think that should really answer the question whether or not it's a reasonable interpretation. Finally, the counsel referred to the VAWA amendments. I think those amendments actually support our argument because they're further evidence that Congress viewed the waivers that are contained within A9C as the exclusive waiver provisions and didn't want to allow illegal aliens to circumvent this 10-year bar through other means. The waiver provisions for A9C are expressly set forth in A9C, and as the Board correctly noted, it has no power by regulation or any other way to alter, augment, or otherwise modify those terms specified by Congress. I see my time has expired, so unless there are any questions, we'll stand. I would like to thank both counsel and on behalf of the panel for an excellent argument on both sides. This is a difficult case, and we appreciate all the work that both counsel, the briefs were well done, and as was the argument. And I think we're still in agreement. Do we say ira-ira, arira, irira? I listen to how everyone says it, and when I listen to two experts and they can't agree on it the same, then I guess we won't decide that in this case. However, thank you both for your argument. The court will stand adjourned until tomorrow morning at 9 o'clock. This matter is submitted. Court for this session stands adjourned. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Canby, Hall, Callahan